## No. 13,082.

INDEPENDENCE INDEMNITY COMPANY *v.* INTERNATIONAL TRUST COMPANY.

(39 P. [2d] 780)

Decided December 21, 1934.

Messrs. BARTELS & BLOOD, Mr. ARTHUR H. LAWS, for plaintiff in error.

Messrs. HUGHES & DORSEY, Mr. W. CLAYTON CARPENTER, Mr. MONTGOMERY DORSEY, for defendant in error.

*En Banc.*

MR. JUSTICE HOLLAND delivered the opinion of the court.

THE parties are here aligned as in the trial court and we will refer to plaintiff in error, Independence Indemnity Company, as the Indemnity Company and the International Trust Company, defendant in error, as the bank.

In the lower court, this case was on trial approximately one month. The transcript of record, containing about 2,100 folios, was filed in this court April 1, 1932. The dispute between the parties is not complicated; the major question presented involves the authority of the Indemnity Company's agent to endorse negotiable paper.

The Indemnity Company, a Pennsylvania corporation,

authorized to transact, and doing, business in Colorado, filed this action for money had and received, against the bank, a Colorado banking corporation with its principal place of business in Denver. The Indemnity Company is engaged in the business of writing many classes of insurance, including surety bonds, some of which are known as "completion and repayment bonds," such as are required in financing the construction of buildings. The complaint contains eight causes of action, each of which is based upon a separate transaction, and involves the proceeds of eight separate checks in the aggregate sum of approximately $170,000. These were checks payable to the Indemnity Company in the course of its "completion and repayment bond" business conducted by its general agent, endorsed by him for deposit in the defendant bank. The record covering the details of the transactions relative to the making of the completion and repayment bonds is lengthy, and to relate same here will serve no good purpose.

In May, 1927, at its home office in Philadelphia, the Indemnity Company entered into a general agency contract with John R. Crews, Jr., of Denver, Colorado, whereby Crews was granted the authority of a general agent and authorized to act as such from the date of the agreement in the territory including Denver and vicinity, with the purpose of procuring applications for the various classes of insurance and to receive and receipt for premiums upon such insurance. By one of the specifications in the original agency contract and amendments thereto, Crews was authorized to make deposits of premiums, collected for surety bonds and insurance policies executed and delivered by him or on his request and on his behalf for the Indemnity Company, in a bank deposit fund to be designated "Independence Indemnity Company, premium account." The agency contract directs that this deposit be made in the United States National Bank of Denver, and the agent is neither authorized nor restricted by such contract to open accounts in other

banks, neither is there to be found express authority nor express restriction to make or endorse negotiable paper for and on behalf of the company.

June 30, 1927, the Indemnity Company executed a power of attorney to Crews, appointing him "its true and lawful attorney-in-fact at Denver, in the State of Colorado, to make, execute and deliver on its behalf as surety, bonds and undertakings, the penal sum of no one of which, in any event, to exceed $200,000." Thereafter in July, 1927, the Indemnity Company requested the insurance commissioner of Colorado to issue a license to Crews as its agent in the state of Colorado, which by its terms constituted Crews the agent of such company "for the transaction of such business as it is authorized to transact in this state," and the renewed license was in effect at the time of the transactions herein involved. Section 2491 of the Compiled Laws of Colorado, 1921, provides: That "while such license remains in force a company shall be bound by the acts of the person named therein within his or her apparent authority as its acknowledged agent."

Immediately thereafter, Crews began operations under the contract and negotiated and executed completion bonds, the general nature of such work being, that the owner of property, desiring to build thereon would enter into a building contract and require the builder to furnish a completion bond and in connection with the making of such bond, the Indemnity Company would require that all funds advanced or to be paid upon the building contract be placed in a fund under the control of the Indemnity Company to be by it disbursed for the building operations, and when and if the building operations are completed as per contract, the completion bond would be cancelled. Sometimes such transactions involved the making of a mortgage by the owner and the proceeds of the loan secured thereby would be deposited and paid out for completion.

Among the first of these operations, the Indemnity

Company, by its letter of instruction to Crews of date June 29, 1927, required that the full proceeds from a loan secured by mortgage should be placed in a separate bank account over which Crews should have joint control, that is, he should countersign all checks. In another letter of instruction from the Indemnity Company to Crews, we find: "I hope this case works out all right, and that in the exercise of joint control you will make sure that the labor and material bills are paid to the proper parties."

In October, 1927, Crews, as general agent of the Indemnity Company, opened an account with the First National Bank of Denver in the name of "Independence Indemnity Company," and checks thereon were signed by Crews in the name of the Indemnity Company by himself as attorney in fact. Thereafter, the Second Mortgage Corporation, a Colorado corporation engaged in the business of making loans on real estate security, including construction loans, and which had for a number of years transacted business with the defendant bank both as depositor and borrower, negotiated with it relative to the borrowing of funds from the bank with which to make construction loans, and in September, 1927, made such arrangements with the bank, whereby the bank agreed to make loans from time to time to the Second Mortgage Corporation which in turn the latter was to reloan to parties desiring to construct buildings. The Second Mortgage Corporation was required by such arrangement to give its note in each instance to the International Trust Company for the amount borrowed, and secure same by taking a trust deed from the owner of real estate to whom it had reloaned the money and requiring from the owner a completion bond, to be signed by the owner of the real estate, and contractor, as principals and by a surety, and the obligee was to be the Second Mortgage Corporation. The owner's note and trust deed securing same and the completion and repayment bond, were to be duly assigned by the Second Mortgage Corporation and delivered to the defendant bank as collateral security for the payment

of its note to the bank by the Second Mortgage Corporation, and the bank required in each instance joint control of the monies so loaned and that the same be deposited in a control account in defendant bank in the name of the surety. In connection with this arrangement, the defendant bank was advised by the Second Mortgage Corporation that the Indemnity Company, plaintiff, would execute the required completion and repayment bonds which was to the satisfaction of the defendant bank.

December 19, 1927, Crews, general agent of the Indemnity Company, opened an account in the defendant bank in the name of the Independence Indemnity Company. On the signature card he stated that checks on said account would be signed ''Independence Indemnity Company by Randolph Crews, resident Vice President.'' The first deposit consisted of two checks aggregating $25,752. One of these checks was in the sum of $15,046, dated December 19, 1927, drawn on the First National Bank of Denver, payable to the Independence Indemnity Company, and signed, Independence Indemnity Company by Randolph Crews, attorney in fact. As to the other check of $10,706, there is no evidence. These checks, after deposit, were collected by the defendant bank and credited to the account.

February 4, 1928, there were similar facts in connection with the deposit of a $950 check. The Indemnity Company contends that Crews had no authority to endorse its name as payee upon either of these checks and that the defendant bank having collected the proceeds from said checks upon an unauthorized endorsement, is liable to the Indemnity Company for the proceeds thereof.

The other causes of action relate to other transactions as they developed from time to time, resulting from the arrangement made between the Second Mortgage Corporation, the defendant bank and Crews. Crews, according to the allegations of defendant bank, transferred $71,380.63 of the funds deposited with it, to the Guardian Trust Company to be credited to the account of a cor-

poration known as the Dencol Investment Company in which account many other items of deposit had been made. Crews subsequently disappeared, and at the time of his disappearance, there remained on deposit in the defendant bank, the sum of $11,539.25, which amount on August 4, 1928, was withdrawn by the Indemnity Company, through its attorneys, and the account closed.

Crews never at any time reported to or informed the Indemnity Company that in the transfer of the funds from the First National Bank, that the check therefor deposited with the defendant bank, was endorsed by him in the name of the Indemnity Company, and never at any time reported to or informed the Indemnity Company that he had in its name or on its behalf made and executed the various completion bonds in connection with the loans heretofore mentioned, the proceeds of which constituted the deposits involving the endorsement herein complained of. Some of the building transactions were completed and the bonds cancelled at the time of Crews' disappearance. Other buiding operations were incomplete and later were completed by the Indemnity Company and title to the different properties taken in the name of the Indemnity Company. These transactions covered a period of about one year, during which time the Indemnity Company had knowledge of some transactions and means of knowledge as to others. It did not, however, avail itself of this means of knowledge, but after the departure of Crews, through its officers sent to Denver, took possession of all of the records of Crews, and inquired of defendant bank as to the accounts, receipts, statements and cancelled checks pertaining to its business and withdrew the balance of the funds on deposit August 4, 1928. It then brought suit against Crews for a part of the funds and obtained judgment for the amount claimed, but did not raise any question concerning the propriety of the deposits with defendant bank, and waited six or eight months before making the claim which is now the basis of this litigation.

Upon ample evidence the court found, that during the years 1927 and 1928, there was a common usage or custom prevailing among indemnity companies engaged in business similar to that of plaintiff, in the state of Colorado in connection with the making of completion bonds, pursuant to which, a joint control of the monies involved was required, the details to be arranged in each instance between the parties in interest.

After hearing extended testimony relative to each particular transaction or cause of action, the court in a lengthy and comprehensive finding, determined the issues in favor of the defendant bank which finding is abundantly supported by the evidence, and according to the well settled rule it will not be disturbed by this court. The Indemnity Company's counsel very ably contends that the endorsement by Crews of checks made payable to the Indemnity Company was unauthorized, and that when the bank obtained possession of the checks and collected the proceeds, it became liable to the payee, notwithstanding such proceeds had been paid out for the benefit of the party from whom the checks were obtained. The Indemnity Company does not question the grant of general agent authority to Crews; does not deny that he was clothed with full authority to conduct, in its behalf and as its agent, the business of the nature here involved, and does not deny that Crews had authority to sign checks for the withdrawal of money deposited to its credit in the conduct of his and its business. He did not endorse either of the eight checks for the purpose of borrowing money on his principal's credit, or for the purpose of sale or discount. Apparently for business reasons, he transferred the funds from one bank to another, and for the purpose of carrying on the business incident to the particular nature of the required joint control of funds, it was essential that he make endorsements of commercial paper, in his principal's name. Ordinary reason compels a recognition of this conclu-

sion, if Crews was to act for his principal, as his authority express and implied, seemed to allow.

As stated above, Randolph Crews was made, constituted and appointed, and held out to the world by the Independence Indemnity Company as its General Agent at "Denver, Colorado, and vicinity." He was clothed and invested by it with all the power and authority, express or implied, both real and apparent, requisite or essential to the performance of the duties of the position. He was placed in full charge of the general agency, which was then established, and was entrusted with the management thereof. His principal was a Pennsylvania corporation, having its home office in Philadelphia, a city far distant from Denver. It was engaged in the business of writing indemnity insurance, namely, fidelity and surety bonds, and including completion and repayment bonds. The business to be carried on and conducted at the general agency, and by its general agent, was the procuring for the Indemnity Company of applications for such indemnity insurance, and to receive, receipt for, and pay over to it all premiums for the same. He was to assist in every way in making adjustment of claims. He was to keep "accounts of premiums collected and other financial transactions affecting the Company." He was "to develop, to the best of his ability, the Company's business in the territory named." He was also constituted its attorney in fact, "to make, execute and deliver, on its behalf as surety, bonds and undertakings." And further, the Indemnity Company, having notified the commissioner of insurance of Colorado of the fact that it desired Randolph Crews, its general agent at Denver, to be appointed to act as its agent in Colorado, a license was issued to him by the commissioner, stating therein that he was the constituted agent of the Independence Indemnity Company in the state of Colorado "for the transaction of such business as it is authorized to transact in this state." And again, it will be observed that the act under which such license was issued provides: "While

such license remains in force a company shall be bound by the acts of the person named therein within his or her apparent authority as its acknowledged agent.''

A general agent has authority to do all things relative to a particular business or trade, and is presumed to act within his authority. Others who know him to be such general agent may deal with him on the assumption of his having full authority without further inquiry.

''It is well settled that the rights of innocent third parties, dealing with an agent within the apparent scope of his authority, cannot be affected by private instructions to such agent, or secret limitations upon his authority. It is no defense that the general agent departed from private instructions when acting within the general scope of his authority, unless such instructions be made public or the insured has notice, or unless the party dealing with the agent is, by reason of the attendant circumstances, or something in the nature of the business, or by custom or by a course of dealing or otherwise, put upon inquiry as to the exact limits of the agent's authority; for the powers of an agent cannot be narrowed by limitations thereon not communicated to parties with whom he deals, and who rely in good faith upon his apparent authority.'' 2 Joyce on Insurance (2d Ed.) p. 1095, §428.

''The rule of strict construction adopted in the case of the execution by an agent of negotiable instruments is not to be pursued to the extent of defeating, by technical interpretation, the obvious intent of the principal as gathered from a reasonable interpretation of the instrument appointing the agent. Hence, if the agent's act in that regard be within such intent it will bind his principal. Much must depend upon the position of the agent and the circumstances of the case, and the agent's authority to execute or indorse commercial paper will be presumed whenever such power is reasonably necessary

to effectuate the main object of the agency." 2 C. J. p. 638, §281.

"The power to make or endorse negotiable instruments may be implied as a necessary incident of powers expressly conferred. Where an entire business is placed under the management of an agent, the authority of the agent is presumed to be commensurate with the necessities of the situation. He has implied authority to do whatever is ordinarily incidental to the conduct of such business, whatever is necessary to the efficient execution of the duties, or whatever is customary in a particular trade." *Whitten v. Bank of Fincastle,* 100 Va. 546, 42 S. E. 309.

The Indemnity Company required Crews, by letter of instructions in a transaction similar to those here involved, to place funds in a separate account over which he was to have joint control. Any loss suffered by the Indemnity Company was not occasioned by the endorsement, which it claimed was unauthorized, but by the signing of checks, to do which the authority of Crews is not questioned. Could Crews conveniently and successfully carry on the business of a distant principal and perform the duties of general agent peculiar to this particular business, without the essential powers, which would include the endorsement of checks for deposit? We are of the opinion, and agree with the trial court, that this was a natural and proper incident within the scope of the agency, and that a person of ordinary prudence, knowing the general character of the agency and the nature of the business conducted, would be justified in relying on the agent having this reasonable and natural power, and the law will protect one who so relies, against injury. *Haynie v. Sites,* 56 Colo. 115, 138 Pac. 42; *Bonanza Co. v. Borrego,* 59 Colo. 365, 148 Pac. 859.

Crews was specifically directed, and it became his duty as general agent, to make deposits in a control account in the name of the Indemnity Company. If the deposit was a check, endorsement was necessary, the en-

dorsement then became an incident to the deposit, and the power of endorsement could then reasonably be said to be an implied power. The Indemnity Company has ratified and adopted some of Crews' similar transactions. It has taken and accepted the benefit of the balance of the funds remaining in defendant bank, deposited by check under endorsement which it now questions and seeks to avoid. This ratification of a part of Crews' transactions with defendant bank ratified his transactions as a whole. *Wheelock v. Hondius,* 74 Colo. 400, 222 Pac. 404; *International Harvester Co. v. Edwards,* 76 Colo. 531, 233 Pac. 164.

There is no suggestion of fraud on the part of the bank nor is it suggested that the bank had any knowledge of fraud on the part of Crews. The question of the construction of section 2491, C. L. 1921, and its constitutionality, raised for the first time in supplemental briefs, cannot find lodgment here, it is absent from the pleadings and evidence, from which the trial court made general and specific findings against the Indemnity Company and the point is not made the basis for any assignment of error.

The judgment is right and therefore affirmed.

MR. JUSTICE CAMPBELL and MR. JUSTICE BOUCK not participating.